UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KIRK LYNCH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-00798-JMS-DML |
| | ) | |
| CORIZON, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting Motion for Summary Judgment and Directing Entry of Final Judgment**

Plaintiff Kirk Lynch filed this lawsuit when he was an inmate at New Castle Correctional Facility ("NCCF") alleging that medical providers at that prison violated his Eighth Amendment rights through their deliberate indifference to several medical needs, including pain, anxiety and depression, headaches, dizziness, blurred vision, gout, cardiovascular problems, high cholesterol, asthma, gastrointestinal issues, hernia, and impacted intestines. Mr. Lynch further claims that this deliberate indifference was a result of a policy and practice of Corizon, LLC,[1] the company contracted to provide medical care to Indiana inmates at that time. The defendants move for summary judgment, and Mr. Lynch has not responded. For the following reasons, the motion for summary judgment is **granted**.

### I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

---

[1] Mr. Lynch named Corizon, Inc. and Corizon, LLC as defendants in this action. But the defendants assert, and Mr. Lynch does not dispute, that they should be treated as the same entity.

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind.Univ.,* 870 F.3d 562, 572-73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

The plaintiff failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are deemed admitted so long as support for them exists in the record. *See* S.D. Ind. Local Rule 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission"); *Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). This does not alter the summary judgment standard, but it does

"[r]educe[] the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). Thus, "[e]ven where a non-movant fails to respond to a motion for summary judgment, the movant 'still ha[s] to show that summary judgment [i]s proper given the undisputed facts.'" *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)).

## II. Facts

Consistent with the standard set forth above, the following facts, unopposed by the plaintiff and supported by admissible evidence, are accepted as true.

### A. The Parties

At the times relevant to the complaint, Dr. Ippel worked at NCCF as a doctor. Dkt. 161-3 ¶ 3. He started working at NCCF in November of 2015. *Id.*

Dr. Fakhry Rafiq[2] worked at a doctor at NCCF from November 9, 2015 through April 7, 2016. Dkt. 161-4 ¶ 3.

At times relevant to Mr. Lynch's Complaint, defendants Gay Mullins and Angela Howard worked at NCCF as Licensed Practical Nurses ("LPNs"). Dkt. 161-1 ¶ 3; dkt. 161-6. Lisa Blount[3] worked as a Registered Nurse at NCCF during the relevant times. Dkt. 161-5 ¶ 3.

LPNs and Registered Nurses can evaluate, assess, and triage patients. Dkt. 161-1 ¶ 4; dkt. 161-5 ¶ 4; dkt 161-6 ¶ 4. They cannot prescribe medication or develop treatment plans. *Id.* Nurses handle inmate Healthcare Request Forms, evaluate patients in "Nursing Sick Call" to determine whether an inmate's medical complaint warrants referral to a doctor or nurse practitioner, and pass medications. *Id.* They also respond to medical emergencies. *Id.*

---

[2] The Court notes that Mr. Lynch misspelled this defendant's name on the amended complaint as Dr. Rafik.

[3] Mr. Lynch misspelled this defendants' name "Blunt" in the amended complaint.

Loretta Dawson worked as a Nurse Practitioner ("NP") at NCCF from August 29, 2016, through March 31, 2017. Dkt. 161-7 ¶ 3.

During the relevant times, Barbara Brubaker[4] worked as an Advanced Practical Nurse at NCCF. Dkt. 161-2 ¶ 3. An Advance Practical Nurse is like a Nurse Practitioner. *Id.*

### B. Mr. Lynch's Medical Conditions

Mr. Lynch's medical care claims are based on care he received from October 12, 2015 to December 20, 2016. *See* dkt. 161-9 at 9-11.

During that time, Mr. Lynch was enrolled in the Chronic Care Clinic at NCCF for pain in his joints. Dkt. 161-10 at 15. He had also been diagnosed with major depressive disorder and was seeing mental health staff to manage this condition. *Id.* As a Chronic Care patient, Mr. Lynch was seen every 90 days by a provider (a physician, physician's assistant, or nurse practitioner) for his chronic conditions. Dkt. 161-7 ¶ 5. If Mr. Lynch needed to see medical staff between chronic care appointments, he could submit a Healthcare Request Form. *Id.* Nursing staff would review and triage the form and either handle the request themselves or refer Mr. Lynch to a provider. *Id.* Mr. Lynch also complained of several other conditions, which are discussed below.

### C. Mr. Lynch's Care in the Fall of 2015

In the Fall of 2015, Mr. Lynch was taking Pamelor[5] for pain and Remeron for depression. Dkt. 161-6 ¶ 6.

Nurse Mullins saw Mr. Lynch on October 12, 2015 after he submitted a Healthcare Request Form stating that the Pamelor was causing him to feel lightheaded and dizzy. Dkt. 161-10 at 20-

---

[4] Mr. Lynch misspelled this defendants' name "Bruebaker" in the amended complaint.

[5] Pamelor is an antidepressant which alters the balance of chemicals in the brain to improve moods and relieve anxiety. Dkt. 161-8 ¶ 7. Pamelor can also be used to treat pain. *Id.*

24. Mr. Lynch reiterated his complaints of dizziness and stated that Pamelor was working, but the side effects were too much. Dkt. 161-1 ¶ 6. Nurse Mullins reached out to NP Brubaker that day and NP Brubaker discontinued his Pamelor based on Mr. Lynch's complaints of side effects. *Id.* Nurse Mullins then referred Mr. Lynch to a medical provider so that the provider could determine whether he should be prescribed any other medication. *Id.*

Nurse Mullins saw Mr. Lynch about a month later, after he submitted a Healthcare Request Form regarding pain in his back, neck, and shoulders. Dkt. 161-10 at 34-36. Nurse Mullins noted that she had previously referred Mr. Lynch to a medical provider for Mr. Lynch's pain and to determine whether he needed to be prescribed additional medication. *Id.* It is unclear whether after Nurse Mullins' referral on October 12, 2015, that Mr. Lynch was scheduled for that referral. Dkt. 161-3 ¶ 8. Nurse Mullins does not know why it would not have been scheduled, but she was not responsible for scheduling. *Id.*

During Mr. Lynch's interactions with Nurse Mullins, it is possible that she instructed Mr. Lynch to take over-the-counter medication to manage his aches and pains, but she would not have instructed him to take double or triple the recommended dose. *Id.* ¶ 10.

Mr. Lynch saw NP Brubaker the next day, in a Chronic Care Clinic appointment. Dkt. 161-10 at 37-39. Mr. Lynch reported he had pain in his joints, but he stated that he was okay at that time. *Id.* He also reported that he was having his usual low back and ankle pains. *Id.* NP Brubaker encouraged Mr. Lynch to lose weight and to increase his activity level because she believed that would help relieve his pain. Dkt. 161-2 ¶ 7. Mr. Lynch noted that he was doing dorm duty without any difficulties, so NP Brubaker concluded that Mr. Lynch was not in such significant pain that he could not work. *Id.* Mr. Lynch also had no unusual anxiety or evidence of depression. *Id.* Based upon Mr. Lynch's complaints, NP Brubaker declined to prescribe Mr. Lynch any pain medication

because she did not think it was medically necessary. *Id*. Mr. Lynch could purchase over-the-counter medications from the commissary to treat his joint pain. *Id.*

A few days later, Mr. Lynch submitted a Healthcare Request Form directed to Nurse Mullins. Dkt. 161-10 at 40. Mr. Lynch indicated that commissary was cancelled and he was unable to purchase non-prescription pain relief. *Id.* Mr. Lynch asked to be referred to a medical provider and stated that he was in severe pain. *Id.* Mr. Lynch was scheduled for a nurse visit on November 23, 24, 25, and 26, 2015, but he did not show up for any of these appointments. *Id.* After the no show on November 26, 2015, Nurse Mullins noted that Mr. Lynch would need to resubmit another Healthcare Request Form if he still needed to be seen. *Id.*

Mr. Lynch alleges that Nurse Mullins saw him in "December" where he complained of pain in his chest and back as well as his asthma, depression, and a hernia. Dkt. 161-9 at 11. But there are no medical records indicating Nurse Mullins saw Mr. Lynch in December of 2015 and Nurse Mullins does not believe she saw him that month. Dkt. 161-1 ¶ 11. In addition, Mr. Lynch admitted at his deposition that he may have meant November instead of December. Dkt. 161-11 at 50:10-14.

On December 28, 2015, Mental Health clinician NP Penelope Wadleigh discontinued Mr. Lynch's Remeron prescription for depression because he had missed 13 of the last 27 doses. Dkt. 161-10 at 43.

**D. Mr. Lynch's Care in Early 2016**

Nurse Mullins saw Mr. Lynch again for a nurse visit on January 15, 2016 after he submitted a Healthcare Request Form complaining of a new back injury. Dkt. 161-10 at 47-51. Nurse Mullins again referred him to a medical provider. *Id.* She also recommended that Mr. Lynch try ice or cool compresses as needed and educated him regarding over-the-counter medication. *Id.*

Mr. Lynch saw Dr. Rafiq on January 21, 2016, for his complaints of upper back pain. Dkt. 161-10 at 52-53. Dr. Rafiq concluded that Mr. Lynch suffered from a strain of the upper spine with no signs of a pinched or damaged nerve. *Id.* Dr. Rafiq advised Mr. Lynch to use ice and heat on his back and to refrain from lifting anything. *Id.* Dr. Rafiq also recommended that Mr. Lynch take over the counter NSAIDs (non-steroidal anti-inflammatory medications), which he could purchase from commissary. *Id.*

On January 25, 2016, Mr. Lynch was scheduled for an appointment with mental health staff, but Mr. Lynch did not arrive for his appointment. *Id.* at 54. Mr. Lynch did see mental health staff on February 2, 2016. *Id.* at 55-57. Mr. Lynch stated that he stopped his Remeron because it made him feel too tired. *Id.* Mr. Lynch indicated that he experienced some increase in depression and anxiety, but no suicidal ideation. *Id.* NP Penelope Wadleigh saw Mr. Lynch again the next day, and noted he was doing well with no problems, that he was not depressed and had no disabling anxiety. *Id.* at 58-61.

Nurse Mullins saw Mr. Lynch about a month later because he submitted a Healthcare Request Form complaining of sciatic nerve pain and numbness in his back, legs, neck, and feet from a new injury. *Id.* at 62-66. Mr. Lynch indicated pain medicine from commissary did not relieve his issues. *Id.* Mr. Lynch's vital signs were normal, with a slightly elevated blood pressure of 132/82. *Id.* Based upon Mr. Lynch's complaints, Nurse Mullins again referred Mr. Lynch to see a medical provider. *Id.* In the meantime, Nurse Mullins also provided Mr. Lynch with exercises he could do which might help him, continued to encourage him to use over-the-counter medications, and to continue the use of heat and ice for his symptoms. *Id.*

On March 7, 2016, Dr. Rafiq saw Mr. Lynch again for a follow-up on his back pain. *Id.* at 67-69. During Dr. Rafiq's exam, Mr. Lynch indicated that his upper back pain was not improving,

but that he was also doing janitorial and mopping work every day. *Id.* Dr. Rafiq noted that it was possible that Mr. Lynch was not resting enough to allow his back to heal, as Dr. Rafiq had recommended *Id.* Dr. Rafiq again encouraged Mr. Lynch to continue taking over-the-counter NSAIDs for pain and to use heat on his back. *Id.* Dr. Rafiq also instructed Mr. Lynch that he should not be working so that his back may heal. *Id.* Mr. Lynch's vital signs were normal and his blood pressure was 106/70. *Id.*

### E. Mr. Lynch's Complaints in Spring 2016

Nurse Mullins saw Mr. Lynch on April 20, 2016 after he submitted a Healthcare Request Form complaining that his high blood pressure caused him to vomit and suffer from dizziness, burry vision, and light-headedness. *Id.* at 71. Mr. Lynch also said he might have had a stroke. *Id.* When Nurse Mullins saw Mr. Lynch, his vital signs were normal and his blood pressure was well-controlled at 112/70. *Id.* at 72-73. Based upon Mr. Lynch's presentation and vital signs, Nurse Mullins did not believe Mr. Lynch required any additional medical care or a referral to a medical provider. Dkt. 161-1 ¶ 15.

On April 27, 2016, Mr. Lynch saw mental health staff who noted he had been off his mental health medications for four months with no recurrence of symptoms. Dkt. 161-10 at 74-81. Mental health staff noted that Mr. Lynch believed he had hypertension, but there was no documentation of this. *Id.*

Mr. Lynch alleges that on May 9, 2016, Nurse Howard denied him medical care while he was experiencing symptoms of a stroke. Dkt. 161-9 at 10. But there are no medical records indicating Nurse Howard saw or interacted with Mr. Lynch on May 9, 2016, nor any other time during the years of 2015 or 2016. Dkt. 161-6 ¶ 6. Nurse Howard has no recollection of ever seeing

Mr. Lynch or evaluating him. *Id.* If Nurse Howard saw or evaluated Mr. Lynch during this time frame, she would have documented it. *Id.*

While Mr. Lynch did not suffer a stroke on May 9, 2016, he did submit a Healthcare Request Form indicating he was dizzy, nauseous, had blurred vision, and did not want to die. He also stated that he refused to see Nurse Mullins, and that all Nurse Mullins did was tell him to drink water. Dkt. 161-10 at 82. Nurse Mullins does not recall telling Mr. Lynch that specifically, but it is possible she told Mr. Lynch to drink water at times as some of Mr. Lynch's complaints of symptoms like cramps and dizziness could be due to dehydration. Dkt. 161-1 ¶ 16.

Nurse Mullins saw Mr. Lynch the next day during a nursing visit. Dkt. 161-10 at 83-90. He reiterated his complaints of dizziness, muscle cramps, stomach cramps, and he also believed he had diabetes. *Id.* Mr. Lynch's vital signs were all normal, and his blood pressure was 118/72. *Id.* Nurse Mullins checked his vision and found no serious problem. *Id.* Nurse Mullins again referred him to a medical provider for further evaluation. *Id.*

Dr. Ippel saw Mr. Lynch the day after that. *Id.* at 91-96. Mr. Lynch complained of dizziness, gait disturbance, and joint pain. *Id.* Mr. Lynch's vital signs were normal and his blood pressure was 118/82. *Id.* Dr. Ippel prescribed Antivert[6] for dizziness and requested a CT scan of Mr. Lynch's head. *Id.*

On May 21, 2016, Mr. Lynch's blood pressure was low at 114/60. *Id.* at 98. Mr. Lynch reported that the Antivert was helping with his dizziness, but it had not eliminated it completely. *Id.*

On May 25, 2016, Mr. Lynch's blood pressure was slightly elevated at 132/88. *Id.* at 106.

---

[6] Antivert is a medication commonly used to treat nausea, vomiting, dizziness, lightheadedness, and loss of balance. *Id.*

Dr. Ippel saw Mr. Lynch again on May 27, 2016 after he again became concerned that he had high blood pressure. *Id.* at 108. At this visit, Mr. Lynch's blood pressure was well controlled at 118/72 and the rest of his vital signs were normal. *Id.* But, because of Mr. Lynch's concerns and because he had had some slightly elevated blood pressure readings in the past, Dr. Ippel prescribed Lisinopril. Dkt. 161-3 ¶ 7. Dr. Ippel and Mr. Lynch discussed his pain, and Mr. Lynch agreed to take Pamelor. *Id.* Dr. Ippel prescribed Pamelor for Mr. Lynch and a trial of Prednisone, which is an oral corticosteroid that can be used to treat arthritis. *Id.*

On June 7, 2016, Mr. Lynch received an MRI[7] of his head at St. Vincent's Hospital in Anderson due to his reported dizziness. Dkt. 161-10 at 122-23. There were no abnormalities, including no evidence of a current or recent stroke. *Id.*; dkt. 161-8 ¶ 23. That day, Mr. Lynch's blood pressure was 120/80. Dkt. 161-10 at 120.

A nurse saw Mr. Lynch two days later for his continued concerns of high blood pressure. Dkt. 161-10 at 128-30. Mr. Lynch's blood pressure was 128/84. *Id.* Mr. Lynch's blood pressure was checked again on June 13, 2016 and it was 126/76. *Id*. at 134.

On June 16, 2016, Dr. Ippel renewed Mr. Lynch's Prednisone prescription over the telephone. *Id.* at 136-37

Dr. Ippel saw Mr. Lynch again a week later for continued complaints of vertigo and dizziness. *Id.* at 141-43. Mr. Lynch reported that he tried taking his Lisinopril in increased doses which helped with his dizziness. *Id.* Mr. Lynch also told Dr. Ippel that the Pamelor was helping, but that it caused him heartburn at night. *Id.* Mr. Lynch was still taking his Antivert for dizziness and vertigo symptoms. *Id.* Mr. Lynch's vital signs were normal, and his blood pressure was 108/70. *Id.* Mr. Lynch's pulse was 77. *Id.* Dr. Ippel did not see any reason to alter Mr. Lynch's Antivert or

---

[7] The MRI was done in place of Dr. Ippel's requested CT scan. Dkt. 161-3 ¶ 6.

Lisinopril prescriptions. Dkt. 161-3 ¶ 10. Dr. Ippel did not tell Mr. Lynch that he would increase his blood pressure medication. *Id.*

**F. Mr. Lynch's Treatment in Summer 2016**

On July 5, 2016, Dr. Ippel started Azithromycin for Mr. Lynch over the phone after he submitted a Healthcare Request Form asking for this medication. Dkt. 161-10 at 146-48.

On July 13, 2016, Mr. Lynch saw mental health staff who noted Mr. Lynch's anxiety and depression were not significant. *Id.* at 153-57.

Mr. Lynch submitted a Healthcare Request Form related to his blood pressure medication and continued dizziness. *Id.* at 160. Nurse Mullins saw Mr. Lynch a few days later. *Id.* at 170-71. Mr. Lynch's vital signs were all normal and his blood pressure was somewhat low at 102/78. *Id.* Nurse Mullins noted that Mr. Lynch was adamant that Dr. Ippel stated he would raise Mr. Lynch's Lisinopril dosage, but there was nothing in the notes indicating that. *Id.* Based upon Mr. Lynch's requests for an increase in medication and lack of any orders for such medication, Nurse Mullins did not believe Mr. Lynch required any additional medical care, nor did he require a referral to a medical provider. Dkt. 161-1 ¶ 19.

On July 25 and 26, 2016, Mr. Lynch submitted two requests regarding high blood pressure readings. Dkt. 161-10 at 169-173. It is not clear where Mr. Lynch was getting these blood pressure readings, but the readings were only slightly elevated, and not life-threatening. Dkt. 161-8 ¶ 31.

On July 28, 2016, Mr. Lynch submitted a Healthcare Request Form listing several medical conditions, many of which had not recently been raised in his medical records. Dkt. 161-10 at 175. He was scheduled for a nurse visit that day but did not show up. *Id.* at 176.

On August 5, 2016, Nurse Mullins saw Mr. Lynch again after he stated he needed to see the doctor. *Id.* at 183-84. Mr. Lynch's blood pressure was slightly low at 112/82 and his pulse was

11

slightly elevated at 117. *Id.* But this slight elevation was not at a dangerous level. Dkt. 161-1 ¶ 21. Nurse Mullins asked Mr. Lynch what specific medical issues he was having, and he stated, "A lot." *Id.* Mr. Lynch did not provide Nurse Mullins with specific information about his medical issues and Nurse Mullins explained she needed such details to refer him to a medical provider. *Id.* Mr. Lynch then decided to leave, and Nurse Mullins told him to sign a refusal paper. *Id.* Nurse Mullins informed Mr. Lynch that he would not be referred to a medical provider. *Id.*

On August 16, 2016, Dr. Charles Kuenzli saw Mr. Lynch and noted that Mr. Lynch had stopped taking some of his medications. Dkt. 161-10 at 187-89. It appears Dr. Kuenzli was referring to Mr. Lynch's Pamelor, which he had been taking for pain. Dkt. 161-8 ¶ 33. Mr. Lynch's vital signs were normal limits. *Id.* His blood pressure was 110/70 pulse was 84. *Id.*

### G. Mr. Lynch's Care in Fall 2016

On September 6, 2016, NP Brubaker saw Mr. Lynch again for his Chronic Care Clinic visit. Dkt. 161-10 at 196-99. At that time, Mr. Lynch was still being seen for his joint pain and he was not on any medication for pain. *Id.* Mr. Lynch's vital signs were all normal, with a slightly elevated blood pressure of 132/90. *Id.* Mr. Lynch reported to NP Brubaker that he had a stroke, but she did not see any evidence of that. Dkt. 161-2 ¶ 8. Mr. Lynch indicated his blood pressure was worsening, but his blood pressure was not at a dangerous level, and he was already being treated with Lisinopril. *Id.* Mr. Lynch stated that he continued to have dizziness and vertigo, but that he continued using Antivert for those symptoms. *Id.* Mr. Lynch reported that his GERD was improving. *Id.* Mr. Lynch reported that his joint pain was constant, but stable. *Id.*

Mr. Lynch had run out of his hypertension medication. *Id.* NP Brubaker confirmed that the pharmacy had reordered his medications and instructed Mr. Lynch that he could go to the medication room at medication time to get his Lisinopril until his refill arrived. *Id.*

With regard to Mr. Lynch's pain, he informed NP Brubaker that he had previous adverse reactions to Celexa and Pamelor and that he had no relief with NSAIDs from commissary. *Id.* Mr. Lynch informed NP Brubaker that he had taken Neurontin for nerve pain in the past. *Id.* NP Brubaker noted that she would review Mr. Lynch's medical records to confirm this. *Id.*

Mr. Lynch also told NP Brubaker that he had asthma, that he was a previous smoker, and that he had not had any treatment for his asthma since 2011. *Id.* NP Brubaker did not see any asthma diagnosis in Mr. Lynch's medical records, but because Mr. Lynch reported difficulty breathing, she decided to order a pulmonary function test. *Id.*

Later that day, NP Brubaker reviewed Mr. Lynch's previous medical records. *Id.* She found that Mr. Lynch was previously prescribed Neurontin 300mg for back pain, but she also noted that there were no diagnostic tests included in the notes to determine whether Mr. Lynch's pain was due to nerve pain. *Id.* She also noted that at the next visit with Mr. Lynch, she would ask him to sign authorizations for more specific medical records from his previous physician. *Id.* However, NP Brubaker did not have another opportunity to see Mr. Lynch, and he was not scheduled to see her again. *Id.* Therefore, she was unable to follow-up with him regarding the more specific medical records or the pulmonary function test. *Id.*

On September 21, 2016, Mr. Lynch was a no show for his scheduled visit. Dkt. 161-10 at 203. Nursing staff saw Mr. Lynch on September 28, 2016 and provided him Tylenol for back pain. *Id.* at 206-08.

On October 5, 2016, Mr. Lynch saw mental health staff who found that he did not have any immediate mental health concerns. *Id.* at 209-10.

On October 7, 2016, NP Loretta Dawson saw Mr. Lynch for complaints of back pain and a possible gout flare-up. *Id.* at 212-14. Mr. Lynch's vital signs were all normal and his blood

pressure was controlled at 120/80. *Id.* Mr. Lynch described his back pain as chronic. *Id.* Mr. Lynch denied that any recent trauma or injury exacerbated his back pain. *Id.* Mr. Lynch also described mild gout[8] symptoms which came on gradually. *Id.* The issue was primarily located in the right and left big toe, and he had joint pain. *Id.* NP Dawson noted Mr. Lynch had an umbilical hernia and that he had mild swelling in his big toes. *Id.* An umbilical hernia does not require any medical intervention unless there are concerns for strangulation or incarceration. Dkt. 161-7 ¶ 6. Mr. Lynch indicated that the pain in his back was not relieved with ibuprofen. Dkt. 161-10 at 212-14. NP Dawson suggested that Mr. Lynch might try Pamelor, which is indicated for both chronic pain and depression, and Mr. Lynch agreed. *Id.* Mr. Lynch did not inform NP Dawson of any previous issues or problems he had experienced with Pamelor. Dkt. 161-7 ¶ 6. NP Dawson would not have known if Mr. Lynch had any previous issues or problems with side effects of Pamelor, as this was her first visit with him. *Id.* In addition, NP Dawson placed Mr. Lynch on Allopurinol[9] for gout. *Id.*

### H. Mr. Lynch's Treatment in Late 2016

NP Dawson saw Mr. Lynch again about two months later in a Chronic Care Clinic appointment after he reported that the Allopurinol and Pamelor were no longer helpful. *Id.* at 226 -28. Mr. Lynch's vital signs were normal, and his blood pressure was 116/70. *Id.* NP Dawson noted that Mr. Lynch's gout had improved and that his feet and toes had no swelling and had good color. *Id.* Mr. Lynch reported he was urinating less than usual, and NP Dawson informed Mr. Lynch this could be caused by the Allopurinol, which effects the kidneys. *Id.* Because of the side effects and

---

[8] Gout is a form of arthritis that typically affects the feet, and high amounts of uric acid cause gout which results in pain, swelling, and discoloration of the feet. *Id.* Patients with gout typically experience flare-ups or gout attacks, which are acute symptoms of gout which can be treated with medication and then they go away. *Id.*

[9] Allopurinol is a medication used to reduce the production of uric acid in the body, which causes gout attacks. *Id.*

because Mr. Lynch's gout flare-up appeared to be resolved, she recommended stopping the Allopurinol. *Id.*

In addition, Mr. Lynch wanted NP Dawson to prescribe an NSAID. *Id.* NP Dawson advised Mr. Lynch that he could purchase NSAIDs from the commissary if he wanted to take them. *Id.*

Nurse Blount saw Mr. Lynch on December 13, 2016,[10] in a nurse visit based upon his complaints that he could no longer take Pamelor as it gave him unwanted side effects. *Id.* at 232-33. Mr. Lynch's pulse was 100 and his blood pressure was 122/82. *Id.*

Dr. Ippel saw Mr. Lynch a few days later for complaints of continued pain after a gout flare-up and discontinuation of his gout medication. *Id.* at 234-39. Mr. Lynch stated that the Allopurinol that he had previously been taking was helping for pain but then stopped helping. *Id.* Mr. Lynch reported to Dr. Ippel that he continued having nerve pain, but he refused to take Pamelor any longer because it made his imbalance worse, and he experienced drowsiness and constipation. *Id.* Mr. Lynch also complained of painful joints that had grown worse over the years. *Id.* Dr. Ippel noted that Mr. Lynch's vital signs were normal, but his blood pressure was a little low at 112/72. *Id.* Mr. Lynch's gait was broad-based, and his movements were a little slow. *Id.*

Dr. Ippel also noted that he had an easily reducible 5 cm hernia. *Id.* An easily reducible hernia of the type Dr. Ippel observed did not require any medical treatment. Dkt. 161-3 ¶ 12. Mr. Lynch's feet were not swollen, but his right big toe was tender. Dkt. 161-10 at 234-36. Dr. Ippel prescribed Cymbalta for Mr. Lynch as opposed to Pamelor for pain. *Id.* Dr. Ippel prescribed another short pulse of steroids and increased Mr. Lynch's previous Allopurinol prescription. *Id.*

---

[10] Mr. Lynch asserted in his interrogatory responses that he saw Nurse Blount (who he misidentified as Nurse Dillow) on December 20, 2016, dkt. 161-9 at 10, but he admitted at his deposition that it may have been December 13, 2016, which is the date reflected in the medical records. Dkt. 161-11 at 177:24-178:8. He also agreed at his deposition that his pulse "possibly might have been" 100, instead of 117 as he stated in his interrogatory. *Id*. at 177:25-178:2.

Dr. Ippel indicated that Mr. Lynch needed to take extra precaution when walking due to his dizziness, but that if his pain decreased, his dizziness might improve. *Id.* Dr. Ippel instructed Mr. Lynch to use heat therapy for his ribs. *Id.* Dr. Ippel noted Mr. Lynch's labs would be monitored and that he would continue following up with Mr. Lynch on his different medical conditions. *Id.*

During Dr. Ippel's visits with Mr. Lynch, he did not make any complaints regarding a headache, heart valve issues, numbness in extremities, or blurred vision. Dkt. 161-3 ¶ 14.

### I. Opinions of Expert Physician William Kleckner

In support of their motion for summary judgment, the defendants have presented an affidavit by Dr. William Kleckner who has been licensed to practice medicine in Indiana since 1980. Dkt. 161-8. Dr. Kleckner reviewed the medical records in this case and based upon his review, it is his opinion to a reasonable degree of medical certainty that physicians Dr. Ippel and Dr. Rafiq, and NP Brubaker and NP Dawson, all acted within the standard of care for medical providers in the decision-making and treatment regarding Mr. Lynch's medical care from 2015 through 2020. *Id.* ¶ 5. Dr. Kleckner also opined that he believes, to a reasonable degree of medical certainty, that Nurse Blount and Nurse Mullins acted within the standard of care for nurses in assessing Mr. Lynch and responding to his complaints and symptoms for that same time frame. *Id.*

### III. Discussion

### A. Deliberate Indifference Standard

Mr. Lynch asserts Eighth Amendment medical care claims against the defendants. At all times relevant to Mr. Lynch's claims, he was a convicted prisoner. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison

and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). However, "not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" *Eagan v. Dempsey*, 987 F.3d 667, 688 (7th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). "'To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (7th Cir. 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)).

As to the first element, a "medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)).

"The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

17

(quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). *See also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Therefore, to survive summary judgment Mr. Lynch must point to evidence of acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Bd. v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

### B. Nurse Gay Mullins

Nurse Mullins interacted with Mr. Lynch several times in 2015 and 2016.

On October 12, 2015, Nurse Mullins discontinued Mr. Lynch's Pamelor prescription after receiving orders from NP Brubaker. Dkt. 161-1 ¶ 6. She then referred Mr. Lynch to a medical

18

provider so that a provider could determine whether Mr. Lynch should be prescribed any other medication. *Id.* It appears that Mr. Lynch was not scheduled immediately after that referral, but Nurse Mullins was not responsible for the medical providers' schedule, only the referrals. *Id.* ¶ 8. When Nurse Mullins saw Mr. Lynch again in November 2015, she noted her previous referral and again referred Mr. Lynch to a provider. *Id.*

Mr. Lynch submitted a Healthcare Request Form on November 23, 2015 directed to Nurse Mullins, but Mr. Lynch did not show up for appointments on November 23, 24, 25, or 26, 2015. Dkt. 161-10 at 40-41.

In short, every time Nurse Mullins saw Mr. Lynch, she evaluated his complaints and provided care or referred him to a provider. Dr. Kleckner confirmed that Nurse Mullins' interactions with Mr. Lynch were within the standard of care. Dkt. 161-8 ¶ 5. And, while Mr. Lynch originally alleged that Nurse Mullins treated him inappropriately in a December 2015 visit, he later agreed that the visit might have occurred in November. Dkt. 161-11 at 50:10-15.

By failing to respond to the motion for summary judgment, Mr. Lynch has not designated evidence that he saw Nurse Mullins in December 2015. Mr. Lynch has also failed to point to any evidence that Nurse Mullins exhibited deliberate indifference to his complaints. She is therefore entitled to summary judgment.

### C. Nurse Angela Howard

Mr. Lynch alleges that on May 9, 2016, Nurse Howard denied him medical care while he was experiencing symptoms of a stroke. Dkt. 161-9 at 10. But there are no medical records indicating Nurse Howard saw or interacted with Mr. Lynch on May 9, 2016, nor any other time during 2015 or 2016. Dkt. 161-6 ¶ 6.  Nurse Howard has no recollection of ever seeing Mr. Lynch or evaluating him. *Id.* If Nurse Howard saw or evaluated Mr. Lynch during this time, she would

have documented it. *Id.* Mr. Lynch alleged in his interrogatory responses that a correctional officer told him that Nurse Howard said she would not see him for his complaints. Dkt. 161-9 at 10. But this statement is inadmissible hearsay. *See* Fed. R. Evid. 802. And, since Mr. Lynch has failed to respond to the motion for summary judgment, he has failed to point to any evidence that Nurse Howard failed to provide him treatment. She is therefore entitled to summary judgment.

### D. Nurse Lisa Blount

Mr. Lynch alleges that Nurse Blount failed to treat his high pulse and heart valve issues.

Nurse Blount saw Mr. Lynch on December 13, 2016 for complaints related to his medication, she took Mr. Lynch's vital signs, all of which were normal. Dkt. 161-10 at 232-34. Mr. Lynch's pulse rate was 100 and his blood pressure was 122/82. *Id.* Based upon Mr. Lynch's complaints, Nurse Blount referred Mr. Lynch to a medical provider. Dkt. 161-5 ¶ 8. Dr. Kleckner confirmed that Nurse Blount's actions were within the standard of care. Dkt. 161-8 ¶ 5.

While Mr. Lynch alleges in an interrogatory response and his deposition that his pulse continued to elevate and that Nurse Blount ignored this condition, dkt. 161-9 at 11, by failing to respond to the motion for summary judgment, he has failed to show that she was deliberately indifferent to a serious medical need. Mr. Lynch never suffered from a stroke or any other injury because of a high heart rate, and subsequent pulse readings taken later were normal. *See* dkt. 161-10 at 234-36.

Because Mr. Lynch has not designated evidence to support a conclusion that Nurse Blount was deliberately indifferent to his serious medical needs, she is entitled to summary judgment.

**E. Dr. Fakhry Rafiq**

Mr. Lynch alleges that Dr. Rafiq refused to treat his back pain on March 7, 2016.[11] At that appointment, Dr. Rafiq was following up on his previous appointment with Mr. Lynch in January 2016 where he instructed him to refrain from lifting anything and to take over-the-counter NSAIDs. Dkt. 161-10 at 67-69. Dr. Rafiq noted it was possible that Mr. Lynch was not allowing his back time to heal because he was still doing janitorial work every day. *Id.* Dr. Rafiq therefore again encouraged Mr. Lynch to take it easy and allow his back to heal, to continue using NSAIDs for pain, and instructed Mr. Lynch to stop working. *Id.*

Dr. Kleckner opines that Dr. Rafiq's actions were within the standard of care for a physician. Dkt. 161-8 ¶ 5. Again, Mr. Lynch has not designated evidence that Dr. Rafiq was deliberately indifferent to his serious medical needs. Dr. Rafiq is therefore entitled to summary judgment.

**F. NP Barbara Brubaker**

NP Brubaker saw Mr. Lynch several times for his medical complaints.

Mr. Lynch saw NP Brubaker on November 18, 2015. Dkt. 161-10 at 37-39. Mr. Lynch reported pain and NP Brubaker encouraged him to lose weight and to increase his activity level because she believed that would help relieve his pain. Dkt. 161-2 ¶ 7. Mr. Lynch noted that he was doing dorm duty without any difficulties, so NP Brubaker concluded that Mr. Lynch was not in significant pain, such that he could not work. *Id.* Mr. Lynch also had no unusual anxiety or evidence of depression. *Id.* Based upon Mr. Lynch's complaints, NP Brubaker declined to prescribe

---

[11] Mr. Lynch alleged in an interrogatory response that Dr. Rafiq failed to treat a number of conditions. Dkt. 161-9 at 10. But at his deposition, he admitted that he does not recall asking Dr. Rafiq about gout, foot pain, or asthma at that time. Dkt. 161-11 at 63:6-13.

Mr. Lynch any pain medication because she did not think it was medically necessary and he could purchase over-the-counter medications from the commissary to treat his joint pain. *Id.*

NP Brubaker saw Mr. Lynch again on September 6, 2016. Dkt. 161-10 at 196-99. At that time, Mr. Lynch was not on any medication for pain. *Id.* Mr. Lynch reported to NP Brubaker that he had a stroke, but she did not see any evidence of that. Dkt. 161-2 ¶ 8. Mr. Lynch indicated his blood pressure was worsening, but his blood pressure was not at a dangerous level, and he was already being treated with Lisinopril. *Id.* Mr. Lynch stated that he continued to have dizziness and vertigo, but that he continued using Antivert for those symptoms. *Id.* Mr. Lynch reported that his GERD was improving. *Id.* Mr. Lynch reported that his joint pain was constant, but stable. *Id.* Because he had run out of his hypertension medication, NP Brubaker confirmed that the pharmacy had reordered his medications and instructed Mr. Lynch that he could go to the medication room at medication time to get his Lisinopril until his refill arrived. *Id.*

Mr. Lynch also told NP Brubaker that he had asthma, that he was a previous smoker, and that he had not been treated for his asthma since 2011. *Id.* NP Brubaker did not see any asthma diagnosis in Mr. Lynch's medical records, but because Mr. Lynch reported difficulty breathing, she decided to order a pulmonary function test. *Id.*

Later that day after, NP Brubaker reviewed Mr. Lynch's previous medical records and found that Mr. Lynch was previously prescribed Neurontin 300mg for back pain, but she also noted that there were no diagnostic tests included in the notes to determine whether Mr. Lynch's pain was due to nerve pain. *Id.* Because she did not see him again, she was unable to follow-up with Mr. Lynch regarding the more specific medical records or the pulmonary function test. *Id.*

The designated evidence reflects that NP Brubaker evaluated Mr. Lynch, considered his complaints, and provided treatment as necessary. Dr. Kleckner opined that her treatment was

within the standard of care. Dkt. 161-8 ¶ 5. Mr. Lynch has failed to rebut this, and NP Brubaker is

entitled to summary judgment.

### G. NP Loretta Dawson

Mr. Lynch saw NP Dawson on October 7 and December 2, 2016. Dkt. 161-10 at 212-14,

226-28.

On October 7, 2016, when NP Dawson first saw Mr. Lynch, he complained of back pain

and gout. Dkt. 161-10 at 212-14, 227-28. NP Dawson suggested Mr. Lynch try Pamelor for his

pain, and Mr. Lynch agreed. *Id.* NP Dawson was unaware of any previous issues Mr. Lynch had

with side effects from Pamelor, as this was her first visit with Mr. Lynch.[12] Dkt. 161-7 ¶ 6. NP

Dawson also prescribed medication to handle Mr. Lynch's gout symptoms. Dkt. 161-10 at 212-

14.

When NP Dawson saw Mr. Lynch again on December 2, 2016, he reported that the

Allopurinol and Pamelor were becoming less helpful since she prescribed them in October. *Id.* at

226-28. Because Mr. Lynch's gout had improved and he was experiencing side effects from the

medication used to treat it, NP Dawson discontinued the gout medication. *Id.* Mr. Lynch wanted

an additional prescription, an NSAID, but NP Dawson informed Mr. Lynch that he could get that

from commissary.[13] *Id.*

---

[12] In his response to the defendants' interrogatories, Mr. Lynch states that NP Dawson "disregarded complaints of side effects," dkt. 161-9 at 11, but he has not pointed to evidence to dispute NP Dawson's statement that she did not know that he had complained of side effects.

[13] Mr. Lynch also alleged in his interrogatory response that NP Dawson discontinued his pain and heartburn medications. Dkt. 161-9 at 11. While it is possible that the heartburn medication ran out around the time he saw her, he has no evidence to support his conclusion that she discontinued it. And, she continued to prescribe Pamelor for Mr. Lynch. Dkt. 161-10 at 226-28. Two weeks later, on December 16, 2016, Dr. Ippel switched Mr. Lynch's prescription to Cymbalta. Dkt. 161-10 at 234.

Dr. Kleckner confirmed that all of NP Dawson's actions were within the standard of care. Dkt. 161-8 ¶ 5. Because Mr. Lynch has failed to respond to the motion for summary judgment, he has failed to dispute this, and NP Dawson is entitled to summary judgment.

**H. Dr. Bruce Ippel**

Mr. Lynch alleges Dr. Ippel was deliberately indifferent between May 20, 2016 through July 27, 2016 by failing to effectively treat Mr. Lynch's strokes, heart valve issues, numbness in his extremities, high blood pressure, severe headaches, dizziness, and blurred vision.

Dr. Ippel saw Mr. Lynch on May 27, 2016, and discussed his concerns regarding his blood pressure. Dkt. 161-10 at 108-12. Dr. Ippel prescribed Lisinopril because of Mr. Lynch's concerns and because he had had a few elevated blood pressure readings. *Id.* Mr. Lynch also complained of back and neck pain. *Id*. Dr. Ippel prescribed Pamelor, as well as a trial of Prednisone. *Id.* During this exam, Mr. Lynch specifically denied headaches, and Mr. Lynch was taking Antivert for dizziness. *Id.* Mr. Lynch did not complain about numbness or blurry vision. *Id.* Mr. Lynch had a normal MRI of his brain. *Id.* at 122-23. On June 16, 2016, Dr. Ippel renewed Mr. Lynch's Prednisone prescription via telephone orders. *Id.*

Dr. Ippel saw Mr. Lynch again on June 24, 2016, and he complained of dizziness and vertigo, but denied headaches. *Id.* at 141-43. Mr. Lynch also did not complain of numbness in his extremities or blurred vision. *Id.* Dr. Ippel performed an eye exam on Mr. Lynch and only noted that there was no nystagmus. *Id.* Mr. Lynch's blood pressure was normal, and he was already taking Lisinopril for blood pressure and Antivert for dizziness. *Id.* Based upon Mr. Lynch's complaints of heartburn, Dr. Ippel spoke with him about prescribing Azithromycin if his heartburn continued, and Dr. Ippel later prescribed it on July 5, 2016. *Id.* Based upon his assessment, Dr.

24

Ippel did not see any reason to alter Mr. Lynch's Antivert prescription for his dizziness or his Lisinopril prescription for his blood pressure. *Id.*

Dr. Kleckner confirmed that all of Dr. Ippel's actions were within the standard of care. Dkt. 161-8 ¶ 5. By failing to respond to the motion for summary judgment, Mr. Lynch has failed to rebut this conclusion, and Dr. Ippel is entitled to summary judgment.

### I. Corizon

Although it is a private entity, Corizon acts under color of state law and therefore may be liable for damages under § 1983 only under the theory announced in *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978). *See Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). "Prevailing on such a claim requires evidence that a [Corizon] policy, practice, or custom caused" the constitutional violation alleged. *Id.* Since the Court has found that Mr. Lynch has failed to present evidence to support a claim that the individual defendants violated his constitutional rights, he also has not supported a claim that a Corizon policy, practice, or custom caused a violation of his rights. *See Petty v. Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) (citing *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010)). Corizon is therefore entitled to summary judgment.

### IV. Conclusion

For the foregoing reasons, the defendants' unopposed motion for summary judgment, dkt. [161], is **granted**. Judgment consistent with this Order and the Order of May 10, 2017, shall now issue.

### IT IS SO ORDERED.

Date: 12/13/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

25

Distribution:

KIRK LYNCH
426 N.W. F Street
Richmond, IN 47374

All Electronically Registered Counsel